IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JEAN WILNER LAFLEUR,**<br><br>               Plaintiff,<br><br>       v.<br><br>**MARK NOOTH, CAPTAIN ROBERT REAL**, in their individual and official capacities,<br><br>               Defendants. | Case No. 2:12-cv-00637-SI<br><br>**OPINION AND ORDER** |

Jean Wilner LaFleur, 2500 West Gate, Pendleton, OR 97801-9699. *Pro se*.

Ellen F. Rosenblum, Attorney General for the State of Oregon; Shannon M. Vincent #054700, Assistant Attorney General, Department of Justice, 1162 Court Street N.E., Salem, OR 97301-4096. Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      Plaintiff Jean Wilner LaFleur ("Mr. LaFleur") was an inmate in the Snake River Correction Institution ("SRCI") from September 29, 2009 to June 8, 2011. Mr. LaFleur filed *pro se* claims under 42 U.S.C. § 1983 alleging that two SRCI employees, Defendants Mark Nooth and Captain Robert Real (collectively, the "Defendants"), violated Mr. LaFleur's

PAGE 1 – OPINION AND ORDER

constitutional right to due process under the Fourteenth Amendment.[1] Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. Dkt. 54. For the reasons discussed below, Defendants' Motion for Summary Judgment (Dkt. 54) is GRANTED.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). A court must liberally construe the filings of a *pro se* plaintiff and afford the plaintiff the benefit of the doubt. *Hebbe v. Pliler*, 637 F.3d 338, 342 (9th Cir. 2012).

---

[1] Plaintiff filed a Proposed Second Amended Complaint on February 28, 2012. Because Defendants did not object and the Court construes *pro se* filings liberally, the Court considered both the Amended Complaint (Dkt. 8) and the Proposed Second Amended Complaint (Dkt. 33) in reaching its decision.

PAGE 2 – OPINION AND ORDER

## BACKGROUND[2]

Plaintiff was an inmate in SRCI from September 23, 2009 until June 8, 2011, at which time he was transferred to the Eastern Oregon Correctional Institution ("EOCI"). Dkt. 65 at 2 ¶ 3. From October 1, 2010 through December 29, 2010, Mr. LaFleur was housed in the Disciplinary Segregation Unit ("DSU") of Special Housing at SRCI as a disciplinary sanction for engaging in a mutual fight with another inmate. Dkt. 65 at 2, ¶ 4. From December 30, 2010 through February 27, 2011, Mr. LaFleur remained in the DSU because of a second disciplinary sanction for refusing to return his meal tray to a corrections officer on December 12, 2010. *Id.* On February 28, 2011, Mr. LaFleur was administratively segregated from the general population in Special Housing while SRCI staff worked to find a suitable place to transfer him. *Id.* at ¶ 5. He remained in administrative segregation from February 28, 2011 until March 27, 2011, when he received a third disciplinary sanction for kicking his cell door and breaking his cell window. *Id.* at ¶ 6. Mr. LaFleur served his third disciplinary sanction in the DSU from March 27, 2011 through April 9, 2011. *Id.* On April 10, 2011, Mr. LaFleur returned to administrative segregation status. *Id.* at ¶ 7. He remained in administrative segregation until June 8, 2011, when he was transferred to EOCI. *Id.*

Mr. LaFleur spent a total of 251 days in Special Housing at SRCI. He served 164 days of disciplinary sanctions: 150 consecutive days from October 1, 2010 through February 27, 2011, and 14 days from March 27, 2011 through April 9, 2011. He spent 87 days in administrative

---

[2] The background facts are taken from Plaintiff's Amended Complaint in this action (Dkt. 8), Plaintiff's Proposed Second Amended Complaint (Dkt. 33), and evidence placed on the record by Mr. LaFleur and Defendants in briefing the pending motion. Where facts alleged by Mr. LaFleur are not disputed by Defendants with record evidence, the Court assumes them to be true for purposes of the pending motion. *Hays v. Reyna*, Case No. 3:12-cv-01640-SI, 2013 WL 3939860 (D. Or. July 30, 2013).

segregation: 27 days from February 28, 2011 until March 27, 2011, and 60 days from April 10, 2011 through June 8, 2011.

Defendants afforded Mr. LaFleur all property and services available to inmates in Special Housing during his terms in administrative segregation. Dkt. 56 at 3 ¶12. This included access to basic visits with relatives and friends, telephones, religious services, education services, and work assignments. Dkt. 65 at 3 ¶¶ 8-14. Mr. LaFleur had to request theses services in order to access them. *Id.* at ¶ 14.

The basic services afforded to Mr. LaFleur in administrative segregation were comparable to the services available to inmates in SRCI's general population. General population inmates may visit with two friends or relatives during regular visiting hours. Or. Admin. R. 291-127-0260(5)(a), (c)(B). In administrative segregation, Mr. LaFleur could hold basic visits with two visitors on his approved visitor list during regular scheduled visiting hours. Dkt. 65 at 3 ¶ 10. Inmates in general population may also make phone calls, although the functional unit manager may restrict the times telephones are available. OAR 291-130-0060(4). Mr. LaFleur had access to two telephones in the segregated housing unit at regular times daily. Dkt. 65 at 3 ¶ 11. General population inmates may attend religious activities in their facility, subject to restrictions when "necessary to maintain facility security, safety, health, and order." OAR 291-143-0130(1). Although Mr. LaFleur could not attend group religious activities, he could access religious services in his cell by making written request to SRCI's Religious Services. Dkt. 65 at 3 ¶ 9. Similarly, Mr. LaFleur could receive visits from Education Services by sending a written communication. *Id.* at ¶ 12. Finally, Mr. LaFleur could have applied for work assignments as a Unit or Yard orderly. *Id.* at 4 ¶ 13.

PAGE 4 – OPINION AND ORDER

Mr. LaFleur filed several complaints with SRCI while in administrative housing requesting a hearing and a transfer out of Special Housing. Dkt. 8 at 9, 12, 14, 15. Defendant Real and Defendant Nooth responded to at least two of the complaints, explaining they were looking for alternative housing for Mr. LaFleur, but his poor behavior made relocating him difficult. *Id.* at 10, 13. Mr. LaFleur filed his complaint in this civil lawsuit under Section 1983 on April 11, 2012.

Mr. LaFleur claims that his confinement in segregation without a hearing violated his Fourteenth Amendment right to due process. Dkt. 8 at 3. He alleges that Defendants deprived him access to visitations, telephones, employment, education, religious services, and rehabilitation services.[3] According to Mr. LaFleur, these alleged deprivations caused him to lose his family and exacerbated his mental health conditions.[4]

## DISCUSSION

Defendants move to dismiss Mr. LaFleur's claims on summary judgment on the grounds that the record does not present a genuine issue of material fact rebutting Defendants' qualified

---

[3] Mr. LaFleur alleges that he did not have access to his Behavioral Health Services, anger management, or Path Founder classes. Dkt. 8 at 9. Mr. LaFleur and Defendants have not elaborated on the nature of these services or provided any evidence to the Court supporting or refuting this allegation. The Court finds that these services are "rehabilitation" services. As a matter of law, a prisoner does not have a constitutional right to rehabilitation under the Fourteenth Amendment. *Marshall v. U.S.*, 414 U.S. 417, 421 (1974) (no fundamental right to rehabilitation from narcotics addiction); *Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (no constitutional right to rehabilitation in the context of a vocational instruction course); *Hoptowit v. Ray*, 282 F.2d 1237, 1254-55 (9th Cir. 1982) (no constitutional right to rehabilitation in the context of vocational and educational programs). Moreover, even if Mr. LaFleur is entitled to these services, he did not present any evidence on the record creating a genuine issue of material fact that Defendants deprived him of these services. Therefore, the Court does not address this issue further in this opinion.

[4] The evidence before the Court does not support, and Mr. LaFleur does not allege, that Defendants denied him medical services for his physical and mental health conditions. The June 6, 2011 receipt of Mr. LaFleur's inmate complaint regarding his administrative segregation described his complaints as "Non-Medical." Dkt. 8 at 11.

PAGE 5 – OPINION AND ORDER

immunity from individual liability. The Court additionally addresses whether Defendants, acting in their official capacities, violated Mr. LaFleur's constitutional rights. The Court construes Mr. LaFleur's filings as arguing that the record does present a genuine issue of material fact as to whether Defendants violated his clearly established constitutional right to due process. For the reasons discussed below, the Court grants Defendants' Motion for Summary Judgment.

**A.  Defendants are Qualifiedly Immune from Suit**

Qualified immunity shields government officials from liability for civil damages arising from conduct that did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A plaintiff can overcome qualified immunity by establishing that "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Courts have discretion to "decid[e] which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The Court ends its inquiry at the first prong, finding no genuine issue of material fact as to whether Defendants deprived Mr. LaFleur of a clearly established constitutional right.

The Due Process Clause of the Fourteenth Amendment protects liberty interests that arise either under the clause itself or under state law. *Chappell v. Manderville*, 706 F.3d 1052, 1062 (9th Cir. 2013). The Due Process Clause alone does not confer a liberty interest in freedom from the conditions or degree of confinement ordinarily contemplated by a prison sentence. *See Hewitt v. Helms*, 459 U.S. 460, 466-468 (1983). State regulatory schemes, on the other hand, may create liberty interests in "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,

PAGE 6 – OPINION AND ORDER

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted).

Mr. LaFleur alleges that the conditions of his disciplinary and administrative segregation violated his liberty interests created under state law by two Oregon Administrative Rules. The Court addresses each in turn.

### 1. Disciplinary Segregation and Or. Admin. R. 291-105-0066(10)(a)

First, Mr. LaFleur alleges that Defendants, acting in their individual capacities, violated his right to constitutional due process by confining him in disciplinary segregation for more than 180 consecutive days. Oregon Administrative Rule 291-105-0066(10)(a) provides that "[n]o inmate shall be confined in disciplinary segregation for more than 180 consecutive days. On the 180th consecutive day of confinement in disciplinary segregation, an inmate shall be reassigned and ordered to other housing." Between October 1, 2010 and June 8, 2011, Mr. LaFleur spent 150 consecutive days in disciplinary segregation, plus 14 non-consecutive days. Because Mr. LaFleur did not spent more than 180 consecutive days in disciplinary segregation, Defendants did not violate Or. Admin. R. 291-105-0066(10)(a). Thus, the Court does not address whether the rule creates a liberty interest.

### 2. Administrative Segregation and Or. Admin. R. 291-046-0025(4)

Second, Mr. LaFleur alleges that Defendants, acting in their individual capacities, violated his right to constitutional due process by holding him in administrative segregation for more than 30 days without a hearing. Or. Admin. R. 291-046-0025(4). Mr. LaFleur spent 59 consecutive days in involuntary administrative segregation from April 9, 2011 through June 7, 2011 without a hearing, violating Oregon Administrative Rule 291-046-0025's mandatory hearing requirement. But mandatory language in a state regulatory scheme alone does not create a liberty interest. *Sandin*, 515 U.S. at 483-84. A plaintiff must also prove that he

PAGE 7 – OPINION AND ORDER

suffered conditions that imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

In *Serrano v. Francis*, the Ninth Circuit analyzed a series of cases to conclude that, "[t]ypically, administrative segregation in and of itself does not implicate a protected liberty interest." 345 F.3d 1071, 1078 (9th Cir. 2003) (collecting cases). Rather than relying on a single indicator of atypical and significant hardship, however, courts conduct a "case by case, fact by fact" analysis of the "condition or combination of conditions or factors" that the plaintiff experienced. *Id.* (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)). Courts frame this analysis using three markers of atypical and significant hardship:

> (1) whether the challenged action 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of the restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Id.* (citing *Sandin*, 515 U.S. at 486-87; *Keenan*, 83 F.3d at 1089).

Under the first marker, Mr. LaFleur experienced the same conditions as other inmates in administrative segregation. Similarly, under the third marker, Mr. LaFleur's segregation did not change the length of his sentence. Thus, the only issue remaining is whether the record presents a genuine issue of material fact as to whether the duration and degree of the conditions of Mr. LaFleur's administrative segregation caused him atypical and significant hardship.

Defendants argue that the duration and degree of the conditions of Mr. LaFleur's administrative segregation did not cause him atypical and significant hardship. Although not explicitly stated, a liberal interpretation of Mr. LaFleur's filings suggests that he alleges that his administrative segregation was excessive in duration and severe in degree.

### a. Duration of Administrative Segregation

Mr. LaFleur spent 86 days in administrative segregation. "[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue[l]' may be tolerable for a few days and intolerably cruel for weeks or months." *Keenan*, 83. F3d at 1089 (citing *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978)). At one end of the duration spectrum, the Supreme Court found that both the indefinite duration and conditions of an inmate's confinement in a maximum security facility caused him atypical and significant hardship. *Wilkinson v. Austin*, 545 U.S. 209, 210-11, 221-24 (2005) (inmates remained indefinitely in isolated cells for twenty-three hours each day with virtually no human contact). But, as discussed below, Mr. LaFleur did not experience conditions in administrative segregation rising to the severity of the confinement in *Austin*, nor did he experience the "intolerably cruel conditions" that the *Keenan* and *Hutto* courts suggested might trigger liberty interests in shorter durations of segregation. Accordingly, the Court's inquiry into duration is tempered by the relatively normal conditions of Mr. LaFleur's confinement.

At the other end of the spectrum from *Austin*, the *Sandin* Court found that 30 days of disciplinary segregation did not invoke a liberty interest. 515 U.S. at 486. Referencing *Sandin*, the Ninth Circuit found that fifteen days of segregation "did not constitute atypical and significant hardship in relation to the ordinary incidents of prison life." *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010). *See also Majahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (fourteen days did not invoke a liberty interest). Although the Ninth Circuit has not developed a bright line rule for what duration of segregation invokes a liberty interest, it has indicated that two years in segregation might be indicative of an atypical and significant hardship under *Sandin*. *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (the two-year duration of a

prisoner's segregation could not be ignored in deciding whether his confinement met constitutional standards).

Other courts have reached widely varying conclusions as to what duration of segregation causes atypical and significant hardship. *Compare, e.g., Skinner v. Cunningham*, 430 F.3d 483, 486-87 (1st Cir. 2005) (40 days of administrative segregation without a hearing during a prison murder investigation was not atypical and significant); *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir. 1998) (two and one-half years of administrative segregation without a hearing during a prison riot investigation was not atypical and significant); *Hardaway v. Meyerhoff*, 734 F.3d 740, 745 (7th Cir. 2013) (182 days in segregation with a confrontational cell mate was not atypical and significant); *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 1997) (90 days was not atypical and significant); *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1997) (70 days was not atypical and significant), *with Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("There are no precise calipers to measure the severity of [segregated housing unit] hardship, but we believe that wherever the durational line is ultimately drawn, 305 days satisfies the standard."); *Shoats v. Horn*, 213, F.3d 140, 144 (3d Cir. 2000) (eight years with no prospect of release was atypical and significant).

Mr. LaFleur spent 86 days in administrative segregation, longer than the plaintiffs in *Sandin*, *Richardson*, or *Majahid* but substantially shorter than the durations that other courts found did not invoke a liberty interest. His segregation was not indefinite; prison officials only kept him in administrative segregation until they found a suitable place to transfer him. Taken in combination with the relatively normal conditions of his segregation, the 86-day duration of Mr. LaFleur's administrative segregation did not impose an atypical and significant hardship compared to the ordinary incidents of his life in prison.

### b. Degree of Conditions in Administrative Segregation

Mr. LaFleur's remaining allegations that Defendants deprived him access to visitations, telephone, employment, education, and religious services underlay his inferred claim that the severe degree of his segregation invoked a liberty interest. The Ninth Circuit has interpreted *Sandin* as requiring a factual comparison of the conditions in segregation with the conditions in the general population to determine whether the degree of conditions imposed in segregation triggers an inmate's liberty interest. *Jackson v. Carey*, 353 F.3d 750, 755 (2003) (*Keenan*, 83 F.3d at 1089 (citing *Sandin*, 515 U.S. at 485-86). If the conditions of plaintiff's segregation do not cause a "major disruption in his environment," then he did not suffer atypical and significant hardship. *Jackson*, 353 F.3d at 755.

Nothing in the record before the Court indicates that the services available to Mr. LaFleur in administrative segregation caused a major disruption in his environment when compared to services offered to inmates in the general population. The Ninth Circuit found that inmates in administrative segregation that "retain[ed] all inmate privileges such as family visits, telephone access, and exercise" did not have their liberty interests violated, despite evidence that spending 23 hours each day in isolation adversely affected them. *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995). Conversely, holding a disabled inmate in a segregated housing unit that did not accommodate his disability invoked a liberty interest. *Serrano*, 345 F.3d at 1079-80 (inmate had to crawl to navigate his cell, avoid the shower, and sit idle during exercise because the segregated housing did not accommodate his wheelchair).

Similar to the inmates in *Anderson*, Mr. LaFleur had access to all services available to inmates in administrative segregation. As highlighted above, these services nearly mirrored the services offered to inmates in general population. The record does not indicate that the changes in Mr. LaFleur's services in administrative segregation compared to the general population in

PAGE 11 – OPINION AND ORDER

any way reaches the severe changes in conditions that the disabled inmate in *Serrano* experienced. Although the Court interprets Mr. LaFleur's allegations liberally, the record as a whole does not present a genuine issue of material fact as to whether Defendants denied Mr. LaFleur access to any of the services available or otherwise created a material disruption in Mr. LaFleur's environment compared to the conditions in SRCI's general population.

Construed in the light most favorable to Mr. LaFleur, the record does not support the reasonable conclusion that the duration or degree of any of the conditions of Mr. LaFleur's confinement in administrative segregation invoked a state created liberty interest protected under the Due Process Clause. Without a constitutional violation, Mr. LaFleur cannot overcome Defendants' qualified immunity by meeting the even higher burden of proving that they violated his clearly established constitutional right. Thus, Defendants are entitled to qualified immunity from suit in their individual capacities.

## B. Defendants Did Not Violate Mr. LaFleur's Constitutional Rights in Their Official Capacities

Mr. LaFleur also alleges that Defendants, acting in their official capacities, violated his constitutional right to due process. Mr. LaFleur seeks two forms of equitable relief against Defendants, a declaration that Defendants violated his constitutional right to due process and an injunction ordering Defendants to expunge his disciplinary cases from his record. Eleventh Amendment state sovereign immunity does not bar a plaintiff from suing a state officer in his official capacity as a person under Section 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." (quotation marks and citation omitted) *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159 n.14 (1985)). A state official cannot claim qualified immunity against claims brought against him in his official capacity. *See Kentucky*, 473 U.S. at 167.

Although Mr. LaFleur can sue Defendants in their official capacities for injunctive relief, the Court finds that, as discussed above, the record does not present a genuine issue of material fact as to whether Defendants violated Mr. LaFleur's constitutional right to due process. Without a constitutional violation, Mr. LaFleur's claims against Defendants in their official capacities, as with Mr. LaFleur's claims against Defendants in their individual capacities, are without merit. As a result, Mr. LaFleur's claims against Defendants in their official capacities are dismissed.

## CONCLUSION

Defendants' Motion for Summary Judgment (Dkt. 54) is GRANTED and all claims against Defendants in their individual and official capacities are DISMISSED.

**IT IS SO ORDERED**.

DATED this 25th day of March, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge